## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 06 2018, 8:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles Anthony Taylor, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | February 6, 2018 <br><br> Court of Appeals Case No. 45A03-1707-CR-1490 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause Nos. 45G03-1403-MR-3 45G03-1511-FD-11 |

**Baker, Judge.**

[1] Charles Taylor appeals his convictions for Felony Murder,[1] Class A Felony Attempted Robbery,[2] Class B Felony Battery,[3] Class C Felony Aggravated Battery,[4] Class B Felony Conspiracy to Commit Robbery,[5] and Class D Felony Conspiracy to Commit Obstruction of Justice.[6]  He argues that the trial court erred by not severing some of the charges, that there is insufficient evidence to support some of his convictions, and that his sentence is inappropriate in light of the nature of the offenses and his character.  Finding no error and that the sentence is not inappropriate, we affirm.

## Facts

[2] On March 10, 2014, Brian Cooper received two calls from someone who wanted to buy marijuana.  Cooper agreed to sell marijuana to the caller and asked his friend, Donnell Goodwin, for a ride.  Goodwin drove Cooper to an address in Gary and sometime thereafter an individual, later identified as Taylor, entered the backseat of the car.

[3] While Taylor and Cooper negotiated a price, a man wearing a ski mask, later identified as Oshae Hampton, walked past the car.  When Hampton reached

---

[1] Ind. Code § 35-42-1-1(2).

[2] I.C. § 35-42-5-1; Ind. Code § 35-41-5-1.

[3] I.C. § 35-42-2-1.

[4] I.C. § 35-42-2-1.5.

[5] I.C. § 35-42-5-1; I.C. § 35-41-5-2.

[6] Ind. Code § 35-44.1-2-2; I.C § 35-41-5-2.

the end of the street, he turned around and Taylor opened a car door to speak with him. After Taylor opened the door, Goodwin noticed that Taylor was armed with a revolver and began to suspect that Taylor and Hampton were working together.

[4] Taylor and Hampton spoke briefly. At some point, Hampton began to pull something from his hoodie and, in response, Goodwin pulled out his gun and fired out the front passenger window. Goodwin's shots injured Hampton, but Goodwin was immediately rendered unconscious following a "flash" to his right. Tr. Vol. I p. 133.

[5] A neighbor heard the gunfire and witnessed someone running away after emerging from the backseat. When the police arrived, they found Hampton screaming on the curb, Goodwin unconscious, and Cooper deceased in the front passenger seat; Goodwin and Cooper each had a gunshot wound to the back of the head.[7] After searching the scene, the police recovered Goodwin's gun, several bullets and casings tied to that gun, and a bullet that had been fired from a revolver.

[6] Later, police learned that a known associate of Hampton, Robert Chandler, lived at the address where the shooting took place. They also discovered that Taylor, Chandler's half-brother, had lived at that location. After police spoke with Goodwin and Hampton, a warrant was issued for Taylor's arrest. On

---

[7] Goodwin survived his injury but is now blind in one eye.

March 19, 2014, Taylor was charged with one count of murder, one count of felony murder, two counts of Class A felony attempted robbery, one count of Class B felony aggravated battery, and two counts of Class C felony battery. On May 27, 2014, he was arrested in Memphis, Tennessee, and extradited back to Indiana. On June 19, 2014, the State amended its charges, adding one count of Class B felony conspiracy to commit robbery and one count of Class B felony attempted robbery.

[7] While in jail, Taylor told another inmate that he and Hampton had planned to rob a man with "high-grade marijuana," that he "shot and killed the guy who shot [Hampton]," and that he left Hampton at the scene. Tr. Vol. III p. 105, 112. Taylor also made two telephone calls relevant to this case:

- On June 18, 2016, Taylor spoke with Chandler, and told him, "Look bro . . . make sure you holler at Water and them and Fonz[8] . . . they got [a witness] on my s***. They got [witness's mother and brother] on my s*** and then some motherf*****s that stay at [address near the shooting]. You heard?" Chandler responded, "I'm doing it right now," and "alright." Eventually, Taylor continued, "Hey, hit the streets with the right people though G, make sure motherf*****s . . . let them know, you know what I mean?" Chandler repeated the names of some of the witnesses and the address and Taylor confirmed. He then said, "Yeah, but look, do not go over there yourself . . . go holler at Water and have Water swerve on motherf*****s, and Fonz and them. . . . You know what I mean?" Chandler answered by repeating "alright" several times. State's Ex. 97.

---

[8] Fonz was dating one of the witnesses at the time of the call. It is unclear in the record who Water is.

- On June 20, 2016, Taylor spoke with his mother and Chandler. He told his mother that he had mailed her information regarding witnesses' identities. Later, on the same call, Chandler asked him about a specific witness and address, and Taylor responded, "Man, don't say nothing . . . . Tomorrow you're going to get [the information I sent]. . . . It'll be there tomorrow . . . . Stop talking, stop saying names like that on the phone . . . ." State's Ex. 98.

[8] Following his conversations with Chandler, the State charged Taylor in a new cause with six counts of Class D felony conspiracy to commit obstruction of justice. The State filed a motion to join the causes and, on March 17, 2017, the trial court granted the motion over Taylor's objection. On May 8, 2017, the State filed its final amended charges, charging Taylor with fifteen counts, including: one count of murder; one count of felony murder; two counts of Class A felony attempted robbery; one count of Class B felony aggravated battery; two counts of Class C felony battery; one count of Class B felony conspiracy to commit robbery; one count of Class B felony attempted robbery; and six counts of Class D felony conspiracy to commit obstruction of justice. The State also alleged that Taylor was an habitual offender and sought several enhancements for use of a firearm.

[9] The trial court conducted a jury trial on May 5-12, 2017, and the jury found Taylor guilty as charged except for murder and one of the counts of Class C felony battery. The jury also found Taylor guilty of the use of a firearm enhancements and determined that Taylor was an habitual offender. As the trial court excused the jury, Taylor began shouting to individuals in the gallery:

Man, pick your head up. I'll be at the crib (inaudible). Them motherf*****s got me railroaded, n***a. They got so many violations—(inaudible.) I'm coming home with my momma. For all you motherf*****s over there, too. I'm the boss. I be home. Don't fool yourself. Justice is a motherf*****. Work this b****. You snitch-a** b****. Yeah, don't worry about it. I know—you got to understand how you be affected, n****—

Tr. Vol. IV p. 35. On May 15, 2017, the trial court found Taylor in contempt for the outburst. Following a June 2, 2017, sentencing hearing, the trial court imposed an aggregate sentence of 147 years imprisonment. Taylor now appeals.

# Discussion and Decision

## I. Severance

[10] First, Taylor argues that the trial court erred by failing to sever the charges of conspiracy to commit obstruction of justice from the initial charges. As a preliminary matter, we observe that, to the extent Taylor contends that the trial court should have severed the charges, Taylor has not properly preserved this issue. After the trial court grants the State's motion for joinder over a defendant's objection, the defendant is required to file a motion for severance. *Ennik v. State*, 40 N.E.3d 868, 875 (Ind. Ct. App. 2015); Ind. Code § 35-34-1-12(a). Taylor did not file a motion for severance. As such, he has waived this issue.

[11] Waiver notwithstanding, we note that two or more offenses may be joined in the same charging information when they are either of the same or similar

character or constitute part of a single scheme or plan. I.C. § 35-34-1-9(a). After causes are joined, a defendant's right to severance will vary on the basis for joinder:

> If offenses have been joined solely because they are of the same or similar character, a defendant is entitled to severance as a matter of right, and a trial court has no discretion to deny a severance motion. If, however, offenses have been joined because the defendant's underlying acts are connected together, we review a trial court's ruling on a severance motion for [error].

*Robinson v. State*, 56 N.E.3d 652, 656 (Ind. Ct. App. 2016) (internal citations omitted), *trans. denied*. Indiana Code section 35-34-1-11(a) provides that when a defendant is not entitled to severance as a matter of right,

> the court . . . shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> > (1) the number of the offenses charged;
> >
> > (2) the complexity of the evidence to be offered; and
> >
> > (3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

[12] Taylor concedes that the conspiracy to commit obstruction of justice charges were joined because they were "based on a series of acts connected together," so he is not entitled to severance as a matter of right. Appellant's Reply Br. p.

5. Taylor also concedes that "neither the number of offenses charged nor the complexity of the evidence would require severance of the charges . . . ." *Id.* Nonetheless, he argues that without severance the factfinder would not have been able to distinguish between the evidence for conspiracy to commit obstruction of justice and the evidence for the other crimes and that the factfinder could not have applied the law intelligently as to each offense. He also contends that the evidence is inconclusive as to his murder and conspiracy to commit obstruction of justice convictions, that the jury was left to speculate why he would attempt to influence witnesses if he had not committed the crimes, and proposes, without citation to authority, that the trial court should have applied an analysis comparable to Indiana Rule of Evidence 403.

[13] We find no reason why the jury would not have been able to distinguish the evidence and apply the law intelligently as to each offense. Taylor does not contend that the jury could not have distinguished the evidence and applied the law intelligently with respect to the other charges before the conspiracy to commit obstruction of justice charges were joined. Though six charges were joined, they were all the same offense and based on limited, clear-cut evidence—two phone calls. Additionally, the evidence relating to the other charges was uncomplicated and easily distinguishable from the calls.

[14] Finally, an attempt to influence or intimidate adverse witnesses demonstrates a consciousness of guilt, *see Johnson v. State*, 472 N.E.2d 892, 910 (Ind. 1985), and, as such, Taylor's threats in the phone calls are inextricably intertwined with the other evidence. In sum, even if Taylor had properly raised this issue,

the trial court would not have erred by denying a motion to sever. *E.g.*, *Robinson*, 56 N.E.3d at 657 (holding that the trial court did not err by denying discretionary severance, considering the "uncomplicated nature" of the evidence and the lack of a significant risk of confusion by the jury or the jury's ability to distinguish the evidence and apply the law intelligently).

# II. Sufficiency

[15] Next, Taylor argues that the evidence was insufficient to support his convictions for conspiracy to commit obstruction of justice. When reviewing challenges to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Bond v. State*, 925 N.E.2d 773, 781 (Ind. Ct. App. 2010). Instead, we consider only the evidence most favorable to the verdict and the reasonable inferences drawn therefrom, and we will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the verdict. *Id.* Reversal is appropriate only when a reasonable trier of fact would not be able to form inferences as to each material element of the offense. *Id.*

[16] To convict Taylor of conspiracy to commit obstruction of justice, the State was required to prove beyond a reasonable doubt that Taylor, with intent to commit obstruction of justice, agreed with Hampton to knowingly or intentionally induce, by threat or coercion, a witness to withhold or unreasonably delay in producing his or her testimony, and that either Taylor or Hampton performed an overt act in furtherance of the agreement. I.C. § 35-41-5-2; I.C. § 35-44.1-2-

2.  "The State is not required to prove the existence of an express agreement" but there must be enough evidence to infer an agreement. *Kemper v. State*, 35 N.E.3d 306, 310 (Ind. Ct. App. 2015). "'It is sufficient if the minds of the parties meet understandably to bring about an intelligent and deliberate agreement to commit the offense.'" *Porter v. State*, 715 N.E.2d 868, 870-71 (Ind. 1999) (quoting *Williams v. State*, 274 Ind. 94, 96, 409 N.E.2d 571, 573 (1980)).

[17]  Taylor contends that the State failed to prove that (1) his statements were threatening or coercive, (2) there was an agreement, and (3) he completed an overt act in furtherance of the agreement. With respect to his first contention, Taylor asserts that the phone conversations between himself and Chandler contained no specific threats; additionally, he insists that because he never communicated any consequences, the evidence was insufficient. *See Sheppard v. State*, 484 N.E.2d 984, 988-89 (Ind. Ct. App. 1985) (noting that, absent an indication to the witness of consequences for failing to comply with the "threat," the communication was no more than a request that the witness not testify).

[18]  In the June 18 call, after providing Chandler with witness names and an address where other witnesses lived, Taylor instructed him to "hit the streets with the right people," to "let them know," and to "holler at Water and have Water swerve on motherf*****s." State's Ex 97. While the meaning of "swerve" is unclear, considering that Taylor gave the names of several adverse witnesses and an address for two others and told Chandler to bring "the right people," a

reasonable factfinder could have inferred that Taylor intended for Chandler and others to intimidate—or outright harm—several witnesses.[9]

[19] Additionally, we note that *Sheppard* and the other cases cited by Taylor are inapplicable to the facts of this case. The issue at hand is whether there was sufficient evidence to find that Taylor and Chandler conspired to commit obstruction of justice, not whether Taylor directly threatened Chandler. Indeed, Taylor's communications with Chandler would not have been threatening because Taylor and Chandler were working together to create and implement a plan to threaten witnesses.

[20] With respect to his contention that the State failed to prove the existence of an agreement, during the June 18 call, Taylor began by telling Chandler to "holler at Water and . . . Fonz" and provided Chandler with the names of some of the witnesses and an address where other witnesses lived. State's Ex. 97. During this time, Chandler can be heard responding, "I'm doing it right now," and "alright." *Id.* After listing the witnesses, Taylor instructed Chandler to "hit the streets with the right people" and to "have Water swerve on motherf*****s"; in each case Chandler responded "alright." *Id.* In the June 20 call, Chandler asked Taylor about another witness and then repeated the address Taylor had given him during the first call, for which Taylor quickly rebuked him, reminding him that he was going to get more information the next day.

---

[9] Taylor repeatedly points to other portions of the phone calls which he suggests lead to a different interpretation, but this is an invitation to reweigh the evidence—an invitation we decline.

Considering this evidence, we have no difficulty concluding that there was sufficient evidence for a reasonable factfinder to infer that Taylor and Chandler reached an agreement.

[21] With respect to his contention that the State did not prove an overt act, Taylor claims that there is no evidence that he did anything beyond telling Chandler that he would send him information from his discovery that identified witnesses. But during the June 20 call, Taylor can clearly be heard telling his mother that he mailed the information regarding witnesses' identities to her house and (while talking to Chandler) that they would get it the next day. While Taylor apparently concedes that he sent the information, he asserts that the mailed information contained nothing beyond what he had already told Chandler on the phone. But that is beside the point; an overt act need not go beyond prepatory steps, *Conn v. State*, 948 N.E.2d 849, 854 (Ind. Ct. App. 2011), and can be satisfied by providing someone with instructions or information to perform the crime, *e.g.*, *Hopper v. State*, 539 N.E.2d 944, 945-46 (Ind. 1989) (finding defendant's participation in discussions regarding exchanging cocaine and marijuana and giving instructions for where to deliver drugs was sufficient to establish conspiracy to deal in cocaine). In other words, when Taylor mailed this information to Chandler, Taylor committed an overt act in furtherance of the conspiracy.

[22] In sum, there was substantial evidence of probative value to support the factfinder's determination that Taylor committed conspiracy to commit obstruction of justice.

# III. Appropriateness

[23] Finally, Taylor contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that we may revise a sentence if, "after due consideration of the trial court's decision," we find that "the sentence is inappropriate in light of the nature of the offense and the character of the offender." We must "conduct [this] review with substantial deference . . . to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (*quoting Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[24] Taylor was sentenced on eight convictions. The sentencing options and outcomes for each conviction are as follows:

- He was convicted of felony murder, for which he faced a sentence of forty-five to sixty-five years, with an advisory term of fifty-five years. Ind. Code § 35-50-2-3. He received a sixty-three-year term, enhanced by thirty years due to his habitual offender status, for a total of ninety-three years. *See* I.C. § 35-50-2-8.[10]
- He was convicted of attempted robbery, a Class A felony, for which he faced a sentence of twenty to fifty years, with an advisory term of thirty years. I.C. § 35-50-2-4. He received a forty-six-year term, enhanced by five years due to the use of a firearm, for a total of fifty-one years, to be served consecutively to the felony murder sentence.

---

[10] The current habitual offender enhancement is capped at twenty years, but the statute in effect when Taylor committed the crimes capped the enhancement at thirty years.

- He was convicted of six counts of Class D felony conspiracy to commit obstruction of justice. For each of these convictions, he faced a sentence of six months to three years, with an advisory term of one and one-half years. I.C. § 35-50-2-7(a). For each count, he was sentenced to three years, to be served concurrently to each other, for a total of three years, to be served consecutively to the prior sentences.

Thus, the trial court imposed an aggregate term of 147 years. Had the trial court imposed maximum, fully consecutive terms on all counts, Taylor would have received an aggregate term of 173 years.

[25] With respect to Taylor's offenses, he and Hampton planned a robbery where they called and lured Cooper to them. Though Goodwin may have shot first, he did not shoot at Taylor. And while it is unclear whether Taylor could have fled, it is clear that his bungled scheme thrust him into a situation where he felt compelled to shoot Cooper and Goodwin in the backs of their heads. Further, after this incident, Taylor conspired with his half-brother to intimidate witnesses. Taylor claims that his offenses were not as bad as some because he did not intend to kill either victim and because he shot Goodwin after Goodwin fired the first shots, but a conviction for felony murder does not require establishing an intent to kill, *Thomas v. State*, 827 N.E.2d 1131, 1133 (Ind. 2005), and Taylor does not explain how Goodwin's initial shots at another person in any way mitigates his own actions.

[26] With respect to Taylor's character, he has a considerable criminal history, including convictions for Class D felony residential entry, Class B felony aggravated battery, and four adjudications of delinquency. Moreover, at the

time Taylor committed the crimes, he was supposed to have been with Lake County Community Corrections but was released in February 2014 due to an oversight. Although aware of the error, Taylor failed to turn himself in and almost immediately began planning the present offenses. Finally, Taylor showed complete and utter disregard for the trial court, as evinced by his willingness to interfere with the State's witnesses and his outburst at the end of his trial.

[27] In sum, we do not find the sentence imposed by the trial court to be inappropriate in light of the nature of the offenses or his character.

[28] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.